# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
# (MILWAUKEE DIVISION)

SCOTT STEELE,

               Plaintiff,

v.                                             Case No. _____

SCRIPPS MEDIA, INC.,

               Defendant.

## COMPLAINT

Plaintiff Scott Steele ("Steele"), by his attorneys Kravit, Hovel & Krawczyk s.c., for his complaint against Defendant Scripps Media, Inc. ("Scripps"), alleges as follows:

## INTRODUCTION

1.      Scripps, a national media company, created and maintained a culture of discrimination and a hostile work environment at one of its media outlets, Milwaukee regional television Station WTMJ Channel 4 ("WTMJ 4" or the "Station"), which employed Scott Steele as a meteorologist.

2.      Steele experienced direct discrimination on the basis of his Jewish faith while he was employed at the Station, and observed similar discrimination with respect to the Station's other Jewish employees, as well as age, race, and gender discrimination more broadly.

3.      Scripps was forced to deal with the discrimination and hostile work environment at WTMJ 4, after receipt and review of an anonymous complaint from a Station employee, and an anonymous staff survey. Those documents outlined rampant anti-Semitism and discrimination, and the maintenance of a hostile work environment at the Station.

4. Scripps conducted its own internal investigation, and then convened a meeting at the Station with all employees on May 23, 2017, during which Station management exonerated itself, and stated that there would be no significant changes because things were "good" at the Station. In the question period, Steele spoke up and challenged Scripps management on the culture of discrimination and hostile work environment at the Station.

5. Instead of using the Station employees meeting as an opportunity to correct the discrimination problems and hostile work environment, and offer solutions to make the workplace more inclusive, Scripps began campaign of retaliation against Steele for speaking up to protest the anti-Semitic discrimination workplace hostility he was suffering, and his criticism of the culture of discrimination at WTMJ 4. Scripps then manufactured false workplace "incidents" against Steele, disciplined him for the imagined incidents, and ultimately wrongfully terminated his employment by the end of summer 2017. Prior to the May 23, 2017, Steele's employment file reflected only positive and appropriate job reviews and performance.

6. Scripps' discriminatory and retaliatory actions against Steele as described herein violated Title VII of the Civil Rights Act of 1964 in multiple ways.

**PARTIES**

7. Plaintiff Scott Steele is a citizen of Wisconsin, residing and domiciled in Mequon, which sits in the Eastern District of Wisconsin, Milwaukee Division. He was employed by Scripps at WTMJ 4 at all times relevant to this complaint.

8. Defendant Scripps Media, Inc. is a national media company with interests in television and radio stations and digital local media sites. Scripps is headquartered at 312 Walnut Street, Suite 2800, Cincinnati, OH 45202. Scripps' registered agent in Wisconsin is located at 8040 Excelsior Drive, Suite 400, Madison, WI 53717. Scripps does substantial

2

business in Wisconsin, including its ownership, control, and operation of the regional television NBC affiliate, WTMJ-TV Channel 4, in Milwaukee. Scripps was Steele's employer from April 2015 until September 2017.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Steele asserts claims that "aris[e] under the Constitution, laws, or treaties of the United States," including violations of Title VII, Civil Rights Act of 1964, as detailed more fully herein.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Steele's claims occurred in this district and division. Scripps controls and operates WTMJ 4, which is located in Milwaukee County, where its employee Steele suffered the wrongful discrimination described in this complaint.

## BACKGROUND

11.     Scott Steele is a veteran broadcaster with three decades of experience as a reporter, meteorologist, and on-air television talent for various news and media companies.

12.     Steele was hired by Journal Broadcast Group in 2007 to work at WTMJ 4. Journal Broadcast Group and the Station were acquired by Scripps in April 2015. At all relevant times, Steele appeared on television as a reporter and meteorologist for WTMJ 4. Steele also worked behind the scenes assisting in the production of news stories and segments.

13.     At all times during his employment with Scripps, Steel was an adherent of the Jewish religion. During his employment with Scripps, Steele publicly identified himself as a believer in and adherent of the Jewish faith.

14.     In 2017, Steele had been with the Station for ten years. He was a popular on-air personality delivering the weather to viewers in an area of the Midwest where weather

3

regularly dominates the news. At the time Steele communicated his complaints of unlawful discrimination to the Station, and then attended the May 23, 2017 meeting that was held concerning the Station's investigation of those complaints, he was nearing the end of a five-year employment contract with Scripps. The five-year contract given to Steele reflected his success, and the high value WTMJ 4 placed on his skills and popularity. Steele entered into his five-year contract with Journal Broadcast Group, who then assigned the contract to Scripps in April 2015 when Scripps acquired Journal Broadcast Group.

15. Prior to the events giving rise to this complaint, Steele's record of performance at WTMJ 4 was exemplary. Steele's official performance reviews always reflected that he "fully met" his performance expectations, and the time slots in which he broadcast weather reports received some of the highest ratings earned by the Station.

16. Scripps' management at WTMJ 4 repeatedly complimented Steele on his job performance. In November 2016, Station News Director Janet Hundley told him that his "stories are really good" and that there "absolutely" were opportunities for him. In January 2017, Steele met with Hundley and Station General Manager Joe Poss about a possible promotion to chief meteorologist (the present chief was retiring) based on his strong performance.

17. On February 7, 2017, Steele met with Hundley and Assistant News Director Diane Irving for his annual performance review. Steele achieved the highest possible score of '5' on each of his individual performance goals and a '4' for his overall performance. (With respect to this scoring system, at this meeting Hundley stated that "a '3' is above average.") Approximately one week later, Steele again met with Hundley and Irving to discuss the weather department's realignment, and during this meeting they repeatedly informed him that he was a "valuable part of the team."

4

18.     At no time prior to Spring 2017—after a decade at the Station—did any manager inform Steele that there were concerns regarding his behavior, interpersonal relationships with other team members, or any problem with his performance in general. Scripps viewed Steele's performance as positive in all respects.

### Scripps Discriminated Against Steele on the Basis of Religion

19.     Steele is Jewish, and during his employment with Scripps he was subjected to tangible acts of discrimination and a hostile work environment on the basis of his religion. Some examples follow:

a.  One morning when Steele arrived to work at the Station he found a yarmulke (Kippah, i.e., a Jewish head-covering) placed on his desk. There was no note or explanation for who placed it there or why, and none was ever provided.

b.  On another occasion Steele arrived to work at the Station to find a Christian cross on his desk. He removed the cross and put it on top of a communal mini-fridge away from his work area. The next day the cross was placed back on Steele's desk, and again he transferred it to the mini-fridge. The next day the cross was pinned to the official department bulletin board adjacent to Steele's desk.

c.  After requesting vacation time for the High Holy Days (Rosh Hashanah and Yom Kippur), Steele learned that a coworker complained about Steele getting "all of his Jew holidays off *and* all of *ours*," or words to that effect. The individual who complained about Steele's "Jew holidays" was later promoted and replaced Steele. It was a constant struggle for Steele and other Jewish employees to take time off for Jewish holidays.

d.  Shortly after Steele requested vacation time for the Jewish High Holy Days, he was summoned into a meeting with News Director Hundley and General Manager Poss. Hundley and Poss removed Steele from a prominent position with demonstrated ratings success, to a lesser role at the Station. Steele was told "we need to appeal to more than just a few people," which Steele interpreted as a reference to his Jewish identity.

e.  Steele's coworkers made additional comments about Steele observing Jewish holidays by saying things like, "So what do you people do on this one?" At first Steele answered as though the questioners were sincerely interested, but it soon became apparent they were not. They asked the same questions for every holiday, repeating them the next year, and continued with comments such as,

"Is this the one where you don't eat?" or "Is this the one where your people eat those crackers?"

f. Certain colleagues would visibly roll their eyes or glare disapprovingly when Steele and the two other Jewish members of the newsroom would hug and wish each other a "Good Shabbos," a traditional greeting for the coming Jewish Sabbath.

g. A manager circulated an internal memorandum detailing the importance of "CHRISTIAN Holy Week" with an explanation of the holidays and the word CHRISTIAN in all capital letters and repeatedly emphasized. There were never any comparable memos about any other religion.

20. Steele's experience is consistent with how Scripps management at the Station treated other Jewish employees of Scripps. Throughout his employment, Steele witnessed and learned about discrimination with respect to other Jewish employees, some incidents of which were contained in the anonymous survey.

21. In one such instance, a younger Jewish man, also an on-air talent, was repeatedly denied the opportunity to even apply for a Station promotion. When this Jewish employee and his outside counsel attempted to force the issue, he was assigned to work on Saturday, the Jewish Sabbath, and ultimately denied the promotion. The Jewish employee directly asked his boss for an improvement plan or some coaching to help him advance to an anchor position, but the supervisor said he would never get the promotion because "it's just who you are," or words to that effect.

22. Another younger Jewish female reporter was repeatedly harassed. On one occasion she collapsed at work, and her doctors advised a schedule change from working third shift. The Station outright refused the schedule change. On another occasion, after advising the assignment editor, she left work briefly during a quiet part of the day to pick up a female health product she urgently needed. The next day she was berated by management, yelled at, and told a

6

disciplinary note would be placed in her file, even though other employees would regularly come and go with impunity.

23.     The younger Jewish employees who were discriminated against, as described above, eventually quit and now work elsewhere. Steele could not follow a similar path and quit because he would have to uproot his family and sever his deep ties to the Milwaukee community. And quitting the Station would have constituted a breach of his employment agreement, which carried significant consequences, including an obligation to pay Scripps $10,000 in penalties, along with the threat of other damages, and subject Steele to a one-year non-compete, thus eliminating any similar employment opportunities in the Milwaukee area for a full year. Steele was therefore forced to endure the continued discrimination, including being denied a promotion for which he was the most qualified applicant.

**Scripps Failed to Deal with Systemic Discrimination at WTMJ**

24.     During Steele's employment with Scripps, the Station allowed and tolerated a pervasive culture of anti-Semitism and other blatant discrimination. Scripps created and maintained a hostile work environment based on religion for its Jewish employees who worked at the Station, including Steele, specifically in the news department. Prior to 2017, Station management participated in, or was aware of, the discriminatory behavior and anti-Semitic environment at the Station. Steele reported to his department supervisor on multiple occasions between 2014 and 2017 that he was the subject of targeting and bullying, including expressing concern about the anti-Semitic environment he experienced and witnessed.

25.     Scripps was forced to confront its discrimination problem in or about April 2017, after an anonymous employee complaint and an anonymous staff survey showed

Scripps had an illegal culture of discrimination and a hostile work environment as a result. Scripps launched an investigation.

26.     As part of its inquiry, Scripps' investigation team of two company lawyers and a regional human resources representative interviewed Steele regarding the complaints of illegal discrimination against those employed at WTMJ 4.

27.     During this interview, which occurred on April 5, 2017, Steele detailed the incidents of discrimination he observed and experienced directly, including the specific incidents described in this complaint, as well as other incidents of racial, gender, and age discrimination.

28.     Upon information and belief, multiple other Station employees were interviewed by Scripps' investigative team.

29.     On May 23, 2017, Station employees were summoned to an all-hands, town-hall style meeting, which was called and led by General Manager Poss and News Director Hundley. Human Resources Manager Cheryl White also participated on behalf of management.

30.     This meeting was apparently intended to announce and discuss the results of Scripps' internal investigation of the culture of discrimination that followed the anonymous employee complaint and the anonymous employee survey.

31.     At the meeting, despite the numerous concerns about discriminatory treatment and hostile workplace then known to the Station, Poss and Hundley did not address those concerns or make any changes. Poss and Hundley said how "good" things were at the Station and how "hurt" they were by the employees' comments in the survey. The Station took no blame for any problems and downplayed whether there actually were any discrimination problems. The employees were offered generic platitudes about improving Station "culture."

8

32.     Poss, Hundley, and White refused to identify how they would address the legitimate concerns raised in the employee survey and failed to address the specific concerns raised by Steele and others in the investigation. A producer and a news anchor asked management to specifically explain what aspects of Station "culture" were problematic and how they considered improving them. Poss and Hundley did not answer, offering only vague and unhelpful generalities, stating that they would prioritize a focus on "team" and "culture." Station management stated that in the future there would be quarterly meetings and feedback would be provided. No action was taken, because in management's words, things at the Station were "good." Hundley dismissed the negative comments in the anonymous survey on the ground that employees just like to "vent."

33.     Steele was unsatisfied with Station management's complete avoidance of the serious discrimination issues and hostile workplace concerns that were brought to Scripps' attention.

34.     Steele spoke up. He commented that he heard Poss talk about "culture" in the last three years, but the staff had not seen any real changes. Steele's comments challenged management on the culture of discrimination and hostile workplace at the Station, and the Station's unwillingness to take any actions to remedy the problems.

35.     Both Poss and Hundley were visibly annoyed and appeared offended at Steele's comment, and responded by repeating the same vague non-answers offered earlier at the meeting. Station management failed to express any willingness to actually address the Station's culture of discrimination.

9

**Scripps Retaliated Against Steele for Objecting to the Culture of Discrimination and an Unlawful Hostile Work Environment**

36.     Shortly after Steele's comments at the town-hall meeting, Scripps embarked on a campaign of retaliation against Steele by fabricating "performance issues" and taking adverse employment actions against him.

37.     Scripps' retaliation began *the very next day* on May 24, 2017, less than 24 hours after the town-hall meeting, when Steele was summoned by Station management—Poss, Hundley, and Executive Producer Nicole Buckley—to an intimidating, unplanned three-on-one meeting.

38.     Poss began the conversation by directly referencing Steele's question from the day before and how Poss wished he had a better answer for it. Poss then abruptly shifted to confront Steele, stating that Station management had detected "a pattern of behavior" by Steele that "needs to be addressed." Poss stated he was concerned about three "serious incidents" involving Steele's work conduct over a short period of time.

39.     At no time prior to participating in Scripps' internal investigation about discrimination, or prior to the all-hands meeting the day before, did Scripps or anyone at the Station ever mention or address any "serious incidents" with Steele, whether through written or oral performance reviews or in any manner whatsoever.

40.     While Poss was describing these three alleged incidents, it became apparent that Scripps was suddenly and unfairly targeting Steele. The incidents, as described, were either untrue or were gross distortions of truth.

41.     The first incident described by the three managers involved an interaction on January 23, 2017 between Steele and a new topical producer, during which Steele was allegedly angry and hostile when the producer approached him about a project, causing her to

10

break down in tears. This was a fabrication of the interaction. In fact, the specific interaction occurred via a short phone call and text messages, which have been preserved and demonstrate cordial interactions between Steele and the producer. Station management's assertions relative to this alleged incident were flatly false.

42. The second incident described by the three managers involved a news story Steele did that ran too long on or about May 22, 2017, allegedly leading to Steele acting angrily and unreasonably towards those involved. This again misrepresents what happened. In truth, Steele sought extra time for the story, received permission to take extra time, and submitted a script that was *approved* by the producer. After the story was edited, the producer informed Steele it was still too long. Steele defended the length of the story, and Executive Produce Nicole Buckley got involved in what became a somewhat passionate exchange. The story was cut down further, completely meeting his supervisor's requested adjustment, and after the fact Steele and Buckley discussed the exchange and how communication could be improved in the future. The conversation ended with smiles and a hug. Scripps attempted to manufacture this into something other than a benign, routine workplace event.

43. The third incident described by the three managers involved another accusation of a story going too long, this time by nine seconds, on or about May 24, 2017. The managers said that the producer did not address the lengthy story with Steele because she was "afraid" of him. This was deliberately misleading. In truth, the script for the story was submitted and approved hours before the newscast, and Steele delivered the story as written. Steele had a positive working relationship with the producer in question, who routinely came to the weather center alone to speak with Steele about various matters. The three managers refused to provide any context or basis for this accusation that the producer was "afraid" of him.

11

44. When Steele attempted to explain and give context to these "incidents" the three Station managers cut him off and expressed no interest in hearing his account of those events. They requested no information from Steele and treated the "incidents" as fact. The managers dismissed any explanation Steele attempted to provide.

45. The meeting concluded with Poss threatening Steele with termination, stating words to the effect of "I would be very concerned if I were you, very concerned." The Station's message to Steele was unmistakable—stop complaining about discrimination and hostile workplace or you'll lose your job.

46. Steele was directed to go to the office of Cheryl White, the Station's Human Resources Manager. When he entered her office, she appeared ready for the visit and had Steele's employment contract out. White then proceeded to criticize Steele about how he "looked" at the all-hands meeting with management. He was criticized for taking notes and told his demeanor implied he thought the meeting was a farce.

47. Steele was again summoned to White's office on June 7, 2017. White interrogated Steele about his conversations with coworkers and demanded Steele identify the coworkers he spoke to about the three-on-one, ambush meeting in which management accused him of wrongdoing. White asked if he was talking to coworkers about whether they were scared of him and persisted in demanding the names of "everyone" Steele spoke with. The fact that White knew Steele was speaking with coworkers made it obvious he was being watched and targeted.

48. In a detailed correspondence to a Scripps attorney on June 9, 2017, Steele outlined the full context of the three "incidents" and explained his fears of retaliation by management, as well as management's continued resistance to addressing the culture of

12

discrimination and hostile workplace at the Station. The result was that Steele was summoned to a meeting on June 20, 2017 with White and two Scripps lawyers.

49.     During the June 20 meeting, Scripps accused Steele of running his own "investigation" by aggressively confronting coworkers about the false accusations previously levied against him by management. In fact, there was no "investigation" performed by Steele— he spoke to some of the coworkers involved in the incidents after he was blindsided with accusations of wrongdoing, to find out if coworkers knew anything about it, and to see if his suspicion that management was retaliating against him was correct. The coworkers Steele spoke to were generally supportive of Steele, and the interactions cordial.

50.     The Scripps lawyers at the June 20 meeting told Steele not to discuss anything about Station management's accusations against him with coworkers. The meeting in part was intended to scare and intimidate Steele into keeping quiet about his mistreatment and the discrimination and hostile workplace he was suffering.

51.     The series of mandatory meetings with Station management and Scripps lawyers described above were a pretext to build a negative file against Steele by manufacturing a narrative that Steele was an intimidating and angry coworker, in order to justify imposing employment consequences for openly challenging the culture of discrimination and hostile workplace Scripps created and tolerated at WTMJ 4.

52.     Station management attempted to use other employees to manufacture false claims against Steele. A coworker informed Steele that she was approached by a midlevel Station manager to file a formal complaint against Steele for engaging in on-air banter. The coworker considered the claim ridiculous. She realized that the manager's motivation was to produce an adverse job consequence to Steele. She reported the incident to Steele.

53. Scripps subjected Steele to other accusations, which either lacked context or outright misrepresented facts, in order to punish him and paint him as an intimidating and hostile coworker, to support employment consequences.

### Scripps Wrongfully Discharged Steele in Retaliation for Objecting to the Culture of Discrimination and an Unlawful Hostile Work Environment

54. The Station's retaliatory actions continued through and after the time Steele's then-current five-year contract was set to expire. Scripps' conduct during the negotiations for a new contract, and the grossly substandard terms eventually offered, were further retaliation for objecting to discrimination at the Station, and culminated in Steele's wrongful discharge.

55. The five-year employment agreement Steele was working under required the Station to begin good faith negotiations to renew months ahead of time. Scripps had the exclusive right to negotiate a new contract with Steele in the 90 days prior to its expiration, meaning Steele could not negotiate with other potential employers during this time. Scripps engaged in no negotiations with Steele, much less good faith negotiations, after the May 23 all-hands meeting.

56. On July 25, 2017, five days before his contract would expire, Station management called Steele to a meeting with Poss, Hundley, and White. At that meeting, a disciplinary letter was hand-delivered to Steele. The reasons proffered for the disciplinary letter were the Station's false and misleading accusations against Steele described herein.

57. The July 25 meeting was held shortly before the scheduled start of Steele's planned vacation and a few days before Steele's five-year contract was to end. As part of the disciplinary meeting, Scripps presented Steele with a new contract, this time for a six-month conditional term, with no salary increase, an overall decrease in compensation given certain

14

beneficial terms to Steele were removed, and a demotion in title and job responsibilities. The new contract re-titled Steele as a "multimedia journalist" ("MMJ") part of the time and was a lesser role than a full-time studio-based weather anchor. The proffered contract constituted an offer of demotion.

58. The six-month contract offered was materially inferior to the contract that it purported to replace, or any other contract in the industry or at the Station for an employee with Steele's experience, prior reviews, and tenure. The six-month term was a drastic reduction from the five-year contract Steele had, and was not close to standard in length for the industry, or at the Station.

59. Upon information and belief, no other similarly situated employee was offered such a short-term contract. Another similarly situated employee was offered a five-year contract shortly before Scripps only offered Steele a six-month contract.

60. Steele objected to the new contract as presented. Scripps by letter extended the five-year contract one month to give the parties additional time to discuss Steele's extension. The parties exchanged numerous proposals for a new contract, but Scripps refused to offer a standard contract, repeatedly citing false and pretextual "performance issues" as justification.

61. Scripps' final new employment contract offer nominally presented a two-year term, but one subject to and qualified by Scripps' stated right to terminate Steele's employment for any reason or no reason at all upon short (60 days) notice. This proffered employment agreement contained no explicit prohibition against the termination of Steele for any reason. Compared to the five-year contract, this proffered contract offered materially less employment security than either his five-year employment agreement with Scripps or its

immediately preceding offer of an employment agreement with a six-month term. The terms of continued employment offered by Scripps became worse, upon information and belief, based on Scripps' intent to wrongfully terminate Steele's employment.

62. The employment security provided by Scripps' final contract offer is below the standard in the industry for an employee with Steele's position, employment tenure, and experience.

63. Steele rejected the last employment contract proposed by Scripps, and he reiterated his demand for a minimally standard contract. Scripps then wrongfully discharged Steele:

    a. Scripps wrongfully terminated Steele's employment by allowing the five-year contract to lapse and then refusing to let him return to work. In response to his offer for a minimally standard employment agreement, Scripps told Steele he "need not report to work or enter the station until further notice." Steele was subsequently sent a box of his belongings directly to his house. By its conduct, Scripps made Steele an at-will employee and then terminated that at-will employment relationship without cause and for an unlawful reason.

    b. In the alternative, Scripps' conduct amounted to a constructive discharge of Steele because he was forced to quit. When combined with the litany of other retaliatory actions—including denying him a promotion, disciplining him without basis, and asserting baseless allegations of workplace misconduct—Scripps' conduct created a working environment that Steele found intolerable, as any reasonable employee would feel from Steele's standpoint. In addition, Steele interpreted Scripps' conduct (as any reasonable employee would) as a clear signal from Scripps that Scripps intended to terminate Steele very shortly even if he signed the substandard contract.

64. Steele's protest of the Station's illegal, discriminatory activities and maintenance of a hostile workplace at WTMJ 4, and his temerity to speak up about the broader culture of discrimination at the Station, were the reasons he was harassed, retaliated against, and wrongfully discharged.

### EEOC Proceedings – Scripps Files a False Document

65.    Steele timely commenced proceedings against Scripps with the Equal Employment Opportunity Commission ("EEOC") by filing a charge of discrimination on March 2, 2018.

66.    The parties made detailed written submissions to the EEOC. The EEOC fully investigated the facts and circumstances surrounding Steele's charge of discrimination.

67.    Scripps relied on the manufactured workplace incidents described in this complaint, and the manufactured defense that Steele voluntarily quit because he turned down the substandard contracts, to defend its conduct and retaliatory termination of Steele.

68.    As proof of the animus Scripps had for Steele and Scripps willingness to lie to justify its illegal conduct, it filed a false and fraudulent document with the EEOC to support its defense—a July 25, 2017 memorandum outlining Steele's performance expectations. The real, original document was delivered to Steele by Poss and Hundley in the July 27 meeting. Steele retained a copy of the original. *But that is not the document Scripps filed with the EEOC.* Instead, Scripps edited the true July 25 memorandum to eliminate provisions favorable to Steele, and add provisions favorable to Scripps.

69.    Here is a two-column comparison of what Poss and Hundley actually wrote and delivered to Steele, and what Scripps fraudulently represented to the government as the actual memo that it submitted to the EEOC:

| ACTUAL MEMO | FALSIFIED MEMO |
|---|---|
| On May 24, 2017 we shared with you concerns regarding interaction with co-workers. Given the issues raised as well as your input to HR, HR became involved and conducted a thorough Investigation. The Investigation is now complete and the findings are that you need to significantly improve your interactions with co-workers by consciously working on your approach, | After discussions (May 24, 2017 and June 20, 2017) with you regarding your negative behavior with your coworkers and conducting your own investigation with your co-workers, we want to be clear that this is not acceptable professional behavior. |

17

| | |
|---|---|
| exercising professional decorum, and demonstrating discernment and good judgment in a consistent manner.<br><br>… | |
| On June 20, 2017 you met with HR and Legal when you **raised allegations of retaliation.** Legal reviewed your concerns and confirmed with you that there was not retaliation and that your management team is allowed to manage your performance and behaviors. | [Deleted] |
| In addition, and going forward, you may not conduct investigations or **ask questions related to your personal development with your co-workers without HR's involvement and taking the lead.** You did so relative to matters that were discussed and this created additional angst and an environment where co-workers were concerned, guarded, and unwilling to provide honest feedback given concerns about your reaction. | [Deleted] |
| We applaud your efforts to improve work relationships . . . . **To clarify, any specific feedback regarding your performance, interaction with co-workers, etc., must include HRs involvement and guidance.** | [Deleted] |
| Scott we expect you to demonstrate acceptable professional behavior and be reminded of the E.W Scripps Code of Conduct, which states in relevant part: | Our Code of conduct states: |
| *Treating Each Other Respectfully*<br>*Scripps employees are committed to treating each other with courtesy, dignity and respect. Treating colleagues with courtesy and respect improves the quality of our workplace and ensures that we attract people with a variety of talents, strengths, backgrounds and personal characteristics that enhance our success.* | *Treating Each Other Respectfully*<br>*Scripps employees are committed to treating each other with courtesy, dignity and respect. Treating colleagues with courtesy and respect improves the quality of our workplace and ensures that we attract people with a variety of talents, strengths, backgrounds and personal characteristics that enhance our success.* |
| [Not included] | You need to be self-aware of the way you respond to co-workers and how people feel when you raise your voice or yell at them when you disagree or don't like what they are saying to you. I.e. your story over-runs the time allowed, scheduling issues editing [sic] |
| [Not included] | You also conducted your own investigation when you were told that your co-workers were troubled and/or avoided confronting issues with you because of the way would typically react to them. This is not acceptable and many of your co-workers were uncomfortable when you approached them asking if they liked you or did they like working with you. We are willing to circulate a 360-degree review to your co-workers to help you assess your behaviors toward them. |
| If you continue to have performance problems, you will | Should this behavior continue, you will be subject to |

18

| be subject to additional corrective action, including but not limited to termination of your employment, pursuant to Section 8(A) of your employment agreement. | further action up to and including termination and possible termination of your contract. This is an addendum to your current 6-month contract. |
|---|---|
| Let us know if you have additional questions or concerns. | |
| [Actually Signed by Janet Hundley and Joe Poss] | [No signature. Type-written name of Ms. Hundley] |
| [Emphasis added] | |

70.     The deliberate alterations in the false memorandum filed with the EEOC are material and significant:

  a. The false memo deletes the true memo's references to Steele's complaint of retaliation made to WTMJ 4 management on June 20, 2017, which is one of the primary, actual reasons for the Station's retaliation against Steele after his decade of successful performance.

  b. The false memo repeatedly deletes references to Scripps' instruction to Steele that he is prohibited from communicating with co-employees for the purpose of employment defense.

  c. The false memo entirely deletes recognition of Steele's efforts to improve work relationships.

  d. The false memo deletes the personal signatures of both Poss and Hundley and replaces them with only a typewritten text of Hundley's name. This is particularly significant because Hundley was removed from her position with Scripps following Steele's formal complaint. Eliminating Poss's name on a fraudulent document is a cover up of the Station manager's direct involvement, in order to place responsibility solely on the no-longer-employed Hundley.

71.     The falsified memorandum is a damning example of a basic truth about Scripps: they will say and do anything to paint Steele in a false light in order to distract from, and cover up, their wrongdoing. The submission of the falsified memorandum establishes that Scripps presented a pretext for discrimination in its challenged treatment of Steele.

72.     With the full facts presented, and after a full investigation, the EEOC found reasonable cause that discrimination occurred. The EEOC investigator making the reasonable cause determination stated: **"I have considered all the evidence disclosed during**

19

**the investigation and have determined that the evidence obtained in the investigation establishes reasonable cause to believe that [Scripps] retaliated against [Steele] when [Scripps] harassed, disciplined and forced him to resign his employment due to his opposition to discriminatory practices in violation of Title VII."**

73.     A true and correct copy of the EEOC's reasonable cause determination is attached hereto as **Exhibit A**. A true and correct copy of the actual July 25 memorandum is attached hereto as **Exhibit B**. A true and correct copy of the falsified July 25 memorandum that Scripps submitted to the EEOC is attached hereto as **Exhibit C**.

74.     Steele has obtained a right-to-sue letter from the EEOC. The letter notes it was mailed on September 20, 2019, and Steele actually received it several days thereafter. This complaint is timely filed.

## CLAIMS FOR RELIEF

### COUNT I
### Discrimination on the Basis of Creed in Violation of Title VII

75.     Steele incorporates by reference all allegations stated above as if fully incorporated herein.

76.     Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); 42 U.S.C. § 1981A.

77.     Steele is Jewish and thus a member of a protected class under Title VII.

78.     Scripps discriminated against Steele by taking adverse employment action against Steele and permitting a hostile work environment as described herein, including, without limitation, that Steele was denied promotion in February 2017; threatened with loss of

employment on unsupportable grounds on May 24, 2017 and multiple times thereafter; disciplined without basis on July 25, 2017; and wrongfully discharged on September 6, 2017.

79. Scripps allowed the hostile work environment to persist and go unaddressed, and took the adverse employment actions against Steele on account of his Jewish religion.

80. Steele has been damaged by Scripps' unlawful discrimination in an amount to be determined at trial.

## COUNT II
## Unlawful Harassment on the Basis of Creed in Violation of Title VII

81. Steele incorporates by reference all allegations stated above as if fully incorporated herein.

82. Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citations and quotations omitted).

83. Steele was subjected to persistent anti-Semitic harassment as described above.

84. The anti-Semitic harassment was unwelcome.

85. The anti-Semitic harassment occurred because Steele is Jewish. Steele's religion was the cause of the anti-Semitic harassment, which was severe and pervasive.

86. The pervasive anti-Semitic harassment that permeated the work environment at WTMJ 4 was both subjectively and objectively offensive, hostile, and abusive. Any reasonable employee would find the harassment offensive, hostile, and abusive, and at the time of harassment, Steele so believed.

87. Scripps was aware of the anti-Semitic harassment or was otherwise negligent in discovering or remedying the harassment. In other words, Scripps knew or should have known about the harassment.

88. Scripps did not take reasonable steps to correct the situations or prevent the harassment from recurring.

89. Steele has been damaged by Scripps' unlawful harassment in an amount to be determined at trial.

**COUNT III**
**Unlawful Retaliation in Violation of Title VII**

90. Steele incorporates by reference all allegations stated above as if fully incorporated herein.

91. Title VII forbids retaliating against an employee "because he has opposed any practice made . . . unlawful . . . by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 1981A.

92. Steele engaged in protected activity under Title VII. Among other things, he opposed practices made unlawful by Title VII when he participated in Scripps' internal investigation and when he challenged Scripps' management regarding discriminatory practices during a town-hall meeting in which Scripps refused to address its discrimination problem.

93. Steele suffered adverse employment actions. Among other things, Scripps denied Steele a promotion; falsely accused him of employment misconduct; disciplined Steele based on these false allegations; and wrongfully discharged him. A reasonable employee would find these actions materially adverse.

22

94.     There is a causal link between the protected activity and the adverse employment activity. Prior to Steele engaging in protected activity, his performance was excellent and his employment record unblemished. Immediately after engaging in protected activity, Scripps engaged in retaliation and adverse employment actions against Steele. The fact that Scripps' purported basis for these actions was false and pretextual is further evidence of a causal connection.

95.     Steele has been damaged by Scripps' unlawful retaliation in an amount to be determined at trial.

**WHEREFORE**, Plaintiff Scott Steele demands judgment as follows:

1.     Compensatory damages and reputational harm and emotional distress damages as authorized by 42 U.S.C. § 1981A.

2.     Past lost salary and benefits and future lost salary and benefits in lieu of reinstatement.

3.     Punitive damages as authorized by 42 U.S.C. § 1981A.

4.     Attorneys' fees as authorized by 42 U.S.C. § 1988.

5.     Such other and further relief as the Court deems just and proper, including any injunctive relief that may be required to give effect to the Court's rulings and/or to fully and finally resolve any existing controversy, claim, or dispute between the parties.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated: December 20, 2019.                  Respectfully submitted,


                                           */s/ Stephen E. Kravit*
                                           Stephen E. Kravit
                                           WI State Bar No. 1016306
                                           Aaron H. Aizenberg
                                           WI State Bar No. 1066340
                                           Benjamin R. Prinsen
                                           WI State Bar No. 1074311
                                           Stuart J. Check
                                           WI State Bar No. 1096287
                                           *Attorneys for Scott Steele*
                                           Kravit, Hovel & Krawczyk s.c.
                                           825 North Jefferson - Fifth Floor
                                           Milwaukee, WI 53202
                                           (414) 271-7100 - Telephone
                                           (414) 271-8135 - Facsimile
                                           kravit@kravitlaw.com
                                           aha@kravitlaw.com
                                           brp@kravitlaw.com
                                           sjc@kravitlaw.com